IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-60592
_____

DELTA FOUNDATION, INC.,

Plaintiff-Appellant -vs-

UNITED STATES OF AMERICA; TOMMY THOMPSON,
SECRETARY, DEPARTMENT OF HEALTH & HUMAN
SERVICES; THE UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

Defendants-Appellees

Appeal from the United States District Court
for the Northern District of Mississippi

August 20, 2002

Before GARWOOD and DENNIS, Circuit Judges, and LITTLE, District Judge.[*]

LITTLE, District Judge:

I. Procedural History

In December of 1997, the Office of Inspector General ("OIG") for the Department of Health and

Human Services ("HHS") completed an investigative audit report of four grants awarded by HHS

to the Delta Foundation ("Delta") in 1991, 1993, 1994 and 1995 under the Community Services

[*] Chief District Judge of the Western District of Louisiana, sitting by designation.

Block Grant program. On the basis of the audit report, the Administration of Children and Families ("ACF") within the HHS issued an Audit Determination Letter to Delta setting forth the government's findings that Delta had violated various HHS regulations and other administrative requirements in its implementation of the four grants, resulting in a disallowance of $1,225,291 in grant expenditures. ACF ordered Delta to repay this amount to HHS.

Delta filed an appeal with the HHS Departmental Appeals Board ("DAB" or "the Board") disputing the findings of the ACF decision and seeking reversal of the ACF order. On 23 November 1999, the DAB affirmed the initial agency determination.

On 2 May 2000, Delta filed a complaint to reverse the pay-back order in the United States District Court for the Northern District of Mississippi claiming that the DAB violated the Administrative Procedure Act and the Due Process Clause of the Fifth Amendment. The district judge referred the complaint to a magistrate. The magistrate issued a report and recommendation suggesting that the district court uphold the DAB's decision and finding that Delta had waived other arguments by not presenting them to the DAB. After hearing objections to the report, the district court adopted the magistrate's report and recommendation and affirmed the DAB's order. The present appeal followed.

Today we decide whether the DAB proceedings are sufficiently adversarial so that failure to raise an issue before the DAB constitutes wavier under Sims v. Apfel, 530 U.S. 103 (2000). We also review the DAB's decision to determine whether the decision was arbitrary and capricious. We find that the DAB's decision was not arbitrary and capricious, and we affirm the DAB's decision.

## II. Background

2

Delta is a Mississippi nonprofit corporation formed to stimulate economic opportunities for the economically disadvantaged Mississippi Delta region. Delta has developed manufacturing companies in Mississippi and Arkansas, with concentrations in electronics, apparel, wood products, and industrial parts. Delta's economic development activities are managed by two for-profit subsidiaries: Delta Enterprises, Inc. ("Delta Enterprises"), which establishes and acquires manufacturing businesses, and Delta Capital Corporation ("Delta Capital"), a venture capital company that provides financial and management services to Delta-based businesses.

Through the Office of Community Services ("OCS"), HHS offers competitive grants under the Community Services Block Grant Program, 42 U.S.C. § 9901 et seq., to private nonprofit community development corporations that have as their principal purpose the planning, developing, or managing of community development projects intended to promote the creation of full-time, permanent jobs or business development opportunities for low-income residents. Between 1991 and 1995, Delta applied for and received four grants from HHS, totaling $1.43 million. The HHS grant applications completed by Delta required that applicants demonstrate that their proposed projects would create full-time permanent jobs of which seventy-five percent would be filled by low-income residents. Grant applicants were instructed that at the end of the prescribed grant periods, varying from twelve to seventeen months, all businesses must be in place and operational. It was required that any critical issues or potential problems that could negatively affect the projects be communicated by the applicant. The grant announcements specified that in selecting applicants, preference would be given to projects that had secured outside funding in an amount equal to some percentage, varying by the grant, of the proposed grant amount.

3

The administration of the grants is governed by various cost and accounting principles set forth in federal regulations and in Office of Management and Building ("OMB") circulars. By accepting a grant award, the grantee agrees to comply with the federal regulations and OMB circulars governing the administration of the grants. In general terms, these provisions require, inter alia, properly documenting expenditures for goods and services. They also require prior approval for any changes within the scope or objectives of the project.

In December of 1997, the OIG of HHS conducted an audit of the four grants awarded to Delta. The OIG faulted Delta for (1) failing to create full-time permanent jobs, (2) using federal funds for purposes unrelated to the objectives of the grants, (3) failing to provide the private capital and in-kind services as contemplated in the grant applications to ensure the success of the grants, and (4) submitting programmatic and financial reports to HHS that were often untimely and inaccurate. The audit concluded that Delta did not administer the grants in accordance with the grant proposals and submitted inaccurate progress reports. The resulting recommendation was that Delta be required to refund $1.43 million to the federal government. The audit detailed the failings of the administration of each of the grants.

The 1991 Grant

In 1991, Delta applied for and received a grant from HHS in the amount of $220,000 to expand its existing railroad spike manufacturing project, Great River Spike, by activating a second production line and consequently creating an additional twenty-five new jobs. Pursuant to the grant terms, Delta would transfer $204,000 of the grant money to its for-profit subsidiary, Delta Enterprises, and retain $16,000 to cover grant administration costs. Delta Enterprises would use the funds to make an equity investment in its wholly-owned subsidiary, Rail Products, Inc., which would

4

then transfer the money to Great River Spike. Great River Spike was a joint venture with another railroad spike manufacturer, Spike Industries, but Rail Products, Inc. was the majority owner.

At the time of the grant application, Delta represented that it would achieve access to $220,000 of private capital. Delta referred obliquely in its application to a pre-existing loan from the Arkansas Industrial Development Commission ("AIDC"), but Delta omitted information concerning the loan's payment status and the loan's after-acquired property clause that would encumber by a primary lien, mortgage, or privilege any property purchased by Great River Spike with the grant funds. Also at the time of the application, Delta's for-profit corporate subsidiary, Delta Enterprises, through which grant funds were to be transferred to Rail Products and then to Great River Spike, had been administratively dissolved by the State of Mississippi on 16 February 1990. This fact was not disclosed by Delta in its grant application.

Contrary to the representations made in the grant proposal, Great River Spike did not use the funds to start a second production line. The funds were instead used to build a second spike machine to be used while the business' other spike machine was repaired. In addition, Delta failed to obtain the private capital that it claimed would be invested in the project. In connection with this project, Delta hired only eight additional employees but did not document whether those hired during the project period were low-income workers as required by the grant award.

As a result of substantial operating loss, Great River Spike terminated operations in January of 1994, six months after the close of the extended grant period.[1] Great River Spike did not report its closing to HHS. In October 1994, the AIDC foreclosed on property pledged as collateral for its

---

[1] On 13 August 1992, Delta requested a nine month no-cost extension of the grant period. HHS granted the extension on 25 November 1992 thereby extending the grant period through 30 June 1993.

loan of $495,000 to Great River Spike. Included in the foreclosed property was the new spike-making machine purchased with the grant funds. AIDC sold this property at public auction for $85,000. At auction, Jim Smith, general manager of Great River Spike and Delta's venture partner, purchased the equipment. HHS was not informed of the foreclosure or the sale. On 17 February 1995, Delta filed a Property Inventory and Disposition Statement claiming that Great River Spike still retained the spike machine purchased with the grant funds.

The 1993 Grant

In 1993, HHS awarded Delta a grant of $460,000 to create New Threads, Inc., an apparel manufacturing company in Greenville, Mississippi (subsequently re-named Greenville Apparel). The goal of Greenville Apparel was to take over the excess sewing work from Fine Vines, an existing apparel manufacturer owned by Delta Enterprises, and to pursue an opportunity to produce the Arizona line of blue jeans for J.C. Penney Co. Delta predicted that Greenville Apparel would create sixty-two new private sector jobs -- the vast majority of which would be filled by low-income individuals. Delta represented that $260,340 in private capital would be contributed to the project. It was Delta's view that the imminent passage of NAFTA was a minimal risk for the project.

In the grant application, Greenville Apparel was proposed as a subsidiary of Delta Enterprises and not a division or expansion of Fine Vines, although Delta did represent that it would initially contract with Fine Vines for production capabilities and management assistance. Delta maintained in the grant application that it would retain $40,000 for grant administration expenses and transfer $420,000 in grant funds to Delta Enterprises in return for equity in Delta Enterprises. In turn, Delta Enterprises was to purchase stock in Greenville Apparel.

6

Ultimately, no stock purchases were made, and Delta instead transferred the money as "paid in capital." Greenville Apparel was not created as an independent entity, but operated instead as a subcontractor of Fine Vines and was located in the Fine Vines facility. Only a few short-term jobs were created through Greenville Apparel. Delta states that Greenville Apparel was unable to realize its customer base or receive the necessary financing to participate in the J.C. Penney /Arizona jeans program, and that the passage of NAFTA negatively affected Greenville Apparel's potential for securing manufacturing jobs.

Additionally, Greenville Apparel used grant funds to purchase twenty-two pieces of sewing equipment. Only four pieces of the equipment were used by Greenville Apparel. The rest remained unused or were used by Fine Vines. Harold Hall ("Hall"), an officer or project manager in several Delta companies and chief operating officer of Delta Enterprises, informed the OIG auditors that it was less expensive to purchase the used equipment in bulk than to purchase as new only those machines needed by Greenville Apparel. None of the machines was in use at the time of the audit. Additionally, grant funds were used to provide loans to Fine Vines, which had been administratively dissolved by the State of Mississippi on 16 February 1990 -- a fact not disclosed by Delta in the grant application.

The 1994 Grant

On 22 June 1994, Delta was awarded a grant of $430,000. The purpose of the grant was to start Metcalfe Manufacturing, Inc. ("Metcalfe"), a metal products manufacturing company in partnership with Reliance Electric. Metcalfe was to create forty-three new full-time permanent jobs. Delta represented that it would obtain private capital in the amount of $460,340. As with the 1991 and the 1993 grants, Delta represented that grant funds would be transferred through an equity

7

investment in Delta Enterprises, which would in turn make an equity investment in Metcalfe.  In total, Delta would transfer $390,000 through Delta Enterprises to Metcalfe, while retaining $40,000 to cover grant administration expenses.

Ultimately, Metcalfe did not develop as an independent subsidiary of Delta Enterprises but was designated as a division of Electro National, a corporate subsidiary of Delta Enterprises.  Few jobs were created through Metcalfe, and two months prior to the end of the grant period, no jobs remained at Metcalfe because it had terminated operations.

Only $235,000 of the grant funds were transferred through Delta Enterprises to Metcalfe, and the stock purchases were never made.  Moreover, Delta loaned $165,000 in grant funds to Fine Vines and Electro National without informing HHS.  Metcalfe used $10,240 of the grant funds to satisfy a credit line and paid $7,978 to Metcalfe employees.  The private capital promised in the grant applications did not materialize.  Furthermore, HHS learned that Electro National had been administratively dissolved by the state of Mississippi on 8 October 1993 and was not reinstated until six months after the grant period expired in 1996.

The 1995 Grant

In 1995, Delta was awarded a grant of $320,000 to start Delta Eagle Fuel Cell, Inc. ("Delta Eagle"), a joint venture to engage in the business of repairing neoprene rubber fuel cells for aircraft and helicopters.  The project was to create thirty new full-time, permanent jobs, and Delta represented that it would secure private capital in the amount of $323,000 committed to the project. Delta contemplated that $35,000 of the grant funds would be used for grant administration purposes. The remaining grant funds would be used to purchase stock in various Delta subsidiaries, including Delta Capital, Action Communications, Inc. and Moeller Manufacturing, Inc. ("Moeller").  In return,

8

these subsidiaries were to make an equity investment in Delta Eagle and provide Delta Eagle with a term loan to conduct the project. The project was stated to be a joint venture corporation between Moeller and Mr. Simmie Brown, who was to contribute his expertise to the project and provide certifications from the Federal Aviation Administration ("FAA").

Ultimately, Delta and Simmie Brown's relationship deteriorated, and the joint venture failed. Delta requested a twelve month extension in the grant period to allow Delta to continue the project solely through Moeller. Prior to considering an extension, HHS requested that Delta provide HHS with documentation, including assurances that Moeller would have the same FAA certification to perform the aircraft repair services. Delta responded by asking for a modification of the grant terms to allow it to abandon the aircraft fuel and flotation repair business and to operate solely as a generalized rubber-products manufacturer. HHS did not allow this modification. HHS also requested that Delta return to the federal government $157,314 in grant funds that had been drawn down but not yet disbursed. Delta did not return these funds. Later, during the HHS audit in 1997, HHS discovered that Action Communications Inc. had been administratively dissolved by the state of Mississippi in 1993 for failure to file an annual report or pay taxes, and Moeller was dissolved in 1994 for failure to pay taxes. These facts were not disclosed in the grant applications.

Moreover, Delta never obtained the private capital it had promised in the grant application. The record indicates that Delta used $50,000 of the grant funds to repay a loan predating the grant period, and transferred $81,000 to Moeller for activities unrelated to the grant project. A garnishment action unrelated to the grant project seized another $5,931. When pressed to prove that it had transferred funds in the form of stock, Delta submitted a copy of a check presumably for the purchase of stock, and a stock certificate for one share of stock. The stock certificate was proved

9

to be false when OIG auditors discovered that at the time the stock certificate was issued, all authorized shares had previously been issued and therefore no stock was available to be issued.

Subsequent Proceedings

On 20 April 1999, the ACF issued an Audit Determination Letter based on the 1997 audit. ACF demanded the return of all grants except for a $204,769 credit reflecting the jobs created by the 1993 and 1994 grants. ACF divided the disallowance into six categories.  First, ACF disallowed $187,447 for lack of documentation to support stated costs, including $110,750 in administrative costs, $25,697 in miscellaneous expenditures, and $51,000 in management fees paid to Fine Vines under the 1993 grant.  Second, ACF disallowed $204,000 attributable to the cost of the seized spike-making equipment in the 1991 grant for Delta's failure to safeguard the assets as required.  Third, ACF disallowed $14,240 in costs attributable to expenditures incurred outside the grant periods.  Fourth, ACF disallowed $438,020 in expenditures because they were unrelated to the grant purposes. Fifth, ACF disallowed $224,270 because Delta "subsidiz[ed] subsidiary organizations" by transferring funds to them without obtaining additional stock in return, in violation of the regulations requiring grant recipients to maintain effective control over grant funds.  Sixth, ACF disallowed $157,314 in grant funds that were neither used by Delta for purposes of the grant nor returned to the federal government as required by the federal regulations governing the grants.  The total amount of the disallowed expenses was $1,225,291.

Delta appealed the Audit Determination to the DAB.  First, Delta suggested that its failure to effect stock purchases and the investment of grant monies in administratively dissolved entities had no material impact on Delta's control over the grant funds.  Second, Delta argued that the $204,000 disallowance for failure to safeguard the assets purchased with the 1991 grant funds was wrong given

10

the limited property interests HHS maintained in that equipment purchased with the grant money. Third, Delta maintained that ACF misapplied the reasonableness standard in disallowing the $97,929 for sewing equipment. Fourth, Delta argued that it had submitted ample documentation to support salary and other costs among the administrative and management fees disallowed for lack of documentation.

On 23 November 1999, the Board upheld the $1,225, 291 in disallowances, finding that Delta had failed to implement projects as described in the grant applications. Specifically, the DAB disallowed the $97,929 expenditures on equipment under the 1993 grant based on the finding that Delta failed to show that the purchase was prudent and consistent with sound business practices. The DAB raised the issue sua sponte as to whether the cost principles of OMB Circular A-122 ("Circular A-122") were the proper principles to apply when measuring the expenditures of the for-profit subsidiaries of the non-profit Delta. The DAB considered the issue waived because Delta had not raised the argument.

Delta sought review of the DAB's decision by filing suit in the United States District Court for the Northern District of Mississippi. Delta alleged that the DAB's opinion violated the Administrative Procedure Act and the Due Process Clause of the Fifth Amendment and sought to vacate the DAB's decision on the grounds that it was "arbitrary, capricious, an abuse of discretion and not in accordance with the law." Delta also sought an injunction against the enforcement of the order. After briefing and oral argument, the magistrate issued a report and recommendation on 23 January 2001 suggesting that the district court affirm the DAB's decision. The district court reviewed the objections to the magistrate's report and then entered final judgment, adopting the magistrate's report. The present appeal was timely filed.

11

### III. Delta Waived the Issue of Improper Applications of Cost Regulations

On appeal, Delta argues that the DAB applied the wrong federal cost regulation in evaluating the expenditures of Delta's for-profit subsidiaries. The DAB reviewed Delta's expenses under the standards set forth in HHS administrative regulations at 45 C.F.R. pt. 74 and in Circular A-122. Delta submits that the DAB should have reviewed Delta's expenses under the standards located in 48 C.F.R. pt. 31. Delta contends that the cost regulations relied on by the DAB did not extend to commercial organizations until August of 1994, and therefore, should not govern the disallowance of expenditures and costs incurred by Delta's for-profit subsidiaries. Further, Delta argues that the cost principles set forth in Circular A-122 do not govern the cost allowances for commercial entitles receiving HHS funding and thus should not have been applied to Delta's for-profit subsidiaries. Because we find that Delta waived this argument by failing to pursue the issue at the administrative level, we do not address whether the DAB applied the proper cost regulations when it disallowed Delta's expenses.

In Sims v. Apfel, 530 U.S. 103 (2000), the Supreme Court examined the question of whether an issue exhaustion requirement should be imposed on a Social Security claimant thus requiring the claimant to raise all issues in its request for review by the Social Security Appeals Council ("Appeals Council") or risk waiving those arguments not raised. The Court held that a requirement of issue exhaustion is not appropriate in the Social Security context. Id. at 112.

In Sims, the Social Security Administration ("SSA") denied the petitioner's claims for benefits, and the petitioner requested that the Appeals Council review her claim. The Appeals Council denied review, and the petitioner filed suit in district court, which rejected all of petitioner's claims. Id. at 105. On appeal, this Court declined to address arguments that petitioner had not raised

in her request for review by the Appeals Council. 200 F.3d 299 (5th Cir. 1998). The Supreme Court reversed, holding that a Social Security proceeding is not an adversarial type of proceeding; therefore, there is no "issue exhaustion" requirement in Social Security Appeals. Sims, 530 U.S. at 112. In reaching this conclusion, the Court began by noting that issue exhaustion requirements are usually created by statute. Id. at 107. Alternatively, an issue exhaustion requirement may be imposed by an agency's regulations requiring a claimant to exhaust all issues in administrative appeals. Id. at 108. Absent either a statute or regulation requiring issue exhaustion, a court may impose it where it is appropriate to do so. The Court recognized that a judicially imposed issue exhaustion requirement may be proper because it is an "analogy to the rule that appellate courts will not consider arguments not raised before trial courts." Id. at 108-09. The degree to which such an analogy applies is dependent on whether the particular administrative proceeding is similar to traditional litigation -- that is, whether the proceeding before the administrative agency is sufficiently "adversarial." Id. at 109. The rationale for requiring issue exhaustion is that parties should have an opportunity to offer evidence before the administrative agency charged with the fact finding responsibility. Id. This rationale is strongest in cases in which "the parties are expected to develop the issues in an adversarial administrative proceeding." Id. at 109-110. The Court warned, however, of the "'wide differences between administrative agencies and courts.'" Id. (quoting Shepard v. NLRB, 459 U.S. 344, 351 (1983)). And the Court counseled "against reflexively 'assimilat[ing] the relation of . . . administrative bodies and the courts to the relationship between lower and upper courts." Id. (quoting FCC v. Pottsville Broad. Co., 309 U.S. 134, 144 (1940)).

In applying this reasoning to the facts of Sims, the Court first recognized that no statute or regulation required issue exhaustion in SSA proceedings. Id. at 107. A plurality of the Court then

13

analyzed the SSA proceedings and determined that, "Social Security proceedings are inquisitorial rather than adversarial." Id. at 110-11. Imposing an issue exhaustion requirement, therefore, would be improper in those cases. Id. at 112. The Court noted specifically that in Social Security proceedings, the Administrative Law Judge ("ALJ") is charged with investigating the facts and developing arguments both for and against granting benefits, and the Appeals Council's review is similarly broad. Id. at 111 (citing Richardson v. Perales, 402 U.S. 389, 400-01(1971)). No representative goes before the ALJ on behalf of the Social Security Commissioner to oppose the claim for benefits, and t here is no indication that the Commissioner opposes claimants before the Appeals Council." Id. The Court pointed out that the Appeals Council conducts the review process in an informal and non-adversarial manner. Id. (citing 20 C.F.R. §404.900(b)). The parties are permitted, but are not required, to file briefs with the Appeals Council. Id. (citing 20 C.F.R. §404.975). The Court also noted that the form on which claimants request review of their case provides only three lines for a claimant to st ate the details of his request for review. An accompanying notice states that the form should only take ten minutes for the claimant to complete. Id. at 112 (citing 20 C.F.R. § 422.205(a)). This fact led the Court to conclude that the Appeals Council does not rely upon the parties to identify the pertinent legal and factual issues. Id. The Appeals Council may review any new material evidence outside of the record promulgated by the parties. Id. at 111 (citing 20 C.F.R. § 404.976(a)). The Court noted that the Appeals Council's review is plenary and the Council may even review cases against the wishes of the applicant. Id. (citing 20 C.F.R. § 404.976(a)).

The Court then concluded that proceedings before the SSA lack an "adversarial" quality and are far more informal than traditional litigation; therefore, the usual rationale for implying an issue-

exhaustion requirement is not present. Accordingly, the Court held that a judicially created issue-exhaustion requirement was inappropriate for Social Security Appeals. Id. at 112.

Turning to the question of whether there is an issue exhaustion requirement for HHS proceedings, we first note that there is neither a statute nor a regulation that mandates issue exhaustion in that context. Accordingly, this court must engage in an analysis consistent with Sims to determine whether proceedings before the HHS are sufficiently adversarial in nature so as to require issue exhaustion at the administrative level.

The regulations governing HHS appeals describe a proceeding that is clearly more adversarial than an informal Social Security proceeding. Both parties in a proceeding before the DAB may be represented, and each party participates in developing an appeal file for the DAB to review, including written arguments supportive of the party's claims. 45 C.F.R. §§ 16.6, 16.8. In order to promote development of the record, the Board may request additional documents or information from the parties, require briefing on the issues in the case, issue orders to show cause and hold preliminary conferences. 45 C.F.R. § 16.9. After the DAB has reviewed the file, the DAB or one of the parties may request a conference in which each party's representative may make oral presentations and submit briefs. 45 C.F.R. §16.10. Additionally, the appellant may request a hearing, which, while remaining "informal," provides each side with an opportunity to make opening and closing statements, and present and cross-examine witnesses. 45 C.F.R. § 16.11(d)(1). Following the hearing, parties are allowed to submit post-hearing briefs or proposed findings and conclusions. 45 C.F.R. § 16.11(e). Thus, unlike the SSA proceedings in which the Appeals Council itself, and not the claimant, has the responsibility for identifying the claims and developing arguments, the parties appear before the DAB as adversaries, charged with presenting their arguments and supporting

15

witnesses and effectively discrediting opposing parties through cross-examination. Given these differences, we hold that there is a sufficiently adversarial nature to HHS proceedings so as to impose an issue exhaustion requirement to those proceedings. A claimant must therefore exhaust all issues in a request for review by the DAB in order to preserve judicial review of those issues. See also Salt Lake Comm. Action Program, Inc. v. Shalala, 11 F.3d 1084, 1088 (D.C. Cir. 1993)(predating Sims but holding traditional exhaustion principles applicable to HHS administrative proceedings before the DAB).

Having determined that claimants in a HHS proceeding must conform with the requirements of issue exhaustion, we next decide whether Delta complied with this requirement. Delta contends that its argument regarding the applicability of Circular A-122 to Delta's for-profit subsidiaries was preserved for review because the HHS agency was aware of the ambiguity as to the appropriate standard. Delta likens its situation to that of the claimant in Trinity Indus. v. Occupational Safety & Health Review Comm'n (OSHRC), 206 F.3d 539 (5th Cir. 2000).

In Trinity, the Secretary of Labor argued that because Trinity failed to raise the issue of employer knowledge in its petition for review, and OSHRC did not consider it, this Court was precluded from deciding the knowledge issue on review. This Court agreed with the Secretary and held, "where the Commission was clearly aware of the knowledge issue and where the knowledge issue constituted a fundamental element of the Secretary's burden of proof," the knowledge issue was properly preserved for the court's review. Id. at 542. "To hold otherwise would place form above purpose. . . ." Id.

Delta presents this holding as support for its argument that the DAB was aware of the ambiguity regarding the appropriate cost review regulation and, therefore, any finding that Delta had

16

failed to exhaust the issue before the DAB would "place form above purpose." The facts of this case, however, differ significantly from Trinity. In Trinity, this Court noted that Trinity did raise the issue of employer knowledge in its *brief* to the Commission, even if it did not raise the issue of knowledge in its *petition* for review before the Commission. Id. The Commission, therefore, was well aware of the "knowledge issue" and had a chance to make a ruling on that issue. Conversely, Delta never raised the issue of the proper cost regulation. The DAB was the first to refer to the question of the proper cost regulations and did so in a footnote in which it observed the ambiguity surrounding the issue of the proper cost regulation, but then concluded by acknowledging that Delta had not raised the issue. Therefore, unlike in Trinity, where the relevant issue was raised --albeit improperly-- Delta did not raise the issue at all. We find that Delta failed to exhaust the issue of proper cost regulations at the administrative level. Consequently, Delta has waived this issue and we are without authority to review this question. We therefore disregard Delta's argument that certain expenditures were disallowed due to reliance on an improper set of cost accounting standards.[2]

## IV. Specific Disallowances by the Board

*A. Standard of Review*

The court reviews the decision of the DAB under 5 U.S.C. § 706(2)(A), Administrative Procedure Act. ("APA"). "Under the APA, the administrative record is reviewed to determine whether the challenged action was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. . . ." Harris v. United States, 19 F.3d 1090, 1096 (5th Cir. 1994). The court's scope of

---

[2]Specifically, Delta has waived certain arguments concerning the disallowances attributable to actions of Delta's for-profit entities relating to the following expenditures: (1) $25,697 in miscellaneous unsupported expenditures (1994 grant), (2) $97,929 in unneeded equipment (1993 grant), (3) $7,979 in miscellaneous unrelated expenditures (1994 grant), (4) $185,081 in loans unrelated to the grants (1993 and 1994 grants), (5) $137,031 in loan payments, internal transfers, and garnishments (1995 grant), and (6) $14,240 in expenditures outside of the grant period (1993 and 1994 grants).

17

review in this matter is very narrow. Louisiana v. Verity, 853 F.2d 322, 327 (5th Cir. 1988). The court's role is not to weigh the evidence pro and con but to determine whether the agency decision "was based on a consideration of the relevant factors and whether there was a clear error of judgment." Id. (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). "Thus, if the agency considers the factors and articulates a rational relationship between the facts found and the choice made, its decision is not arbitrary and capricious." Harris, 19 F.3d at 1096 (quoting Motor Vehicles Mfrs. Ass'n, 463 U.S. at 43). The "agency's decision need not be ideal, so long as it is not arbitrary or capricious, and so long as the agency gave at least minimal consideration to relevant facts contained in the record." Id. (quoting Motor Vehicles Mfrs. Ass'n, 463 U.S. at 43).

B. *Disallowance for "Subsidizing Subsidiary Organizations"*

The first disallowance challenged by Delta concerns $224,270 apparently used for "subsidizing subsidiary organizations."[3] HHS has the authority to disallow costs not materially in compliance with the grant award if "appropriate under the circumstances." See 45 C. F. R. § 74.62(a). In reaching the decision to disallow the $224,270 the Board discussed, inter alia, Delta's failure to make equity investments contemplated in its grant applications, and its failure to disclose that the subsidiary corporations involved in each of the four grants were administratively dissolved by the State of Mississippi. Based on these actions, the Board determined that Delta viewed grant funds as capital that could be used by any of its subsidiaries without any regard for compliance with directives from

---

[3] This disallowance is a "catch-all" of sorts, which rejects all expenses not otherwise disallowed for more specific reasons, less "credit" given to Delta for jobs actually created by grant projects.

18

the grantor. We now consider Delta's efforts to demonstrate that the Board's decision was arbitrary and capricious.

1.  Delta's Failure to Purchase Stock As Promised

In each of the four grant applications, Delta promised to transfer grant funds to Delta Enterprises and Delta Capital in return for stock. The promised equity investments, however, were never made by Delta. In fact, these investments could not have been made as contemplated because all authorized shares in Delta Capital had been previously issued. Nonetheless, as late as 1997, Delta continued to misrepresent that these purchases had been made, and even presented a false stock certificate to auditors in an effort to advance the charade.

Delta now admits to channeling the funds to its subsidiaries as "paid in capital." Both Delta Enterprises and Delta Capital were wholly owned by Delta; thus, whether transferred as "paid in capital," or through an equity investment, Delta claims that the funds remained under its control at all times. On that basis, Delta concludes that its departures from the grant proposals were "inconsequential," rather than "material" as required by statute. See 45 C. F. R. § 74.62(a) (providing for disallowance of costs if a recipient materially fails to comply with the terms and conditions of an award).

The Board's decision must be upheld on the agency's grounds, or not at all. Institute for Tech. Dev. v. Brown, 63 F.3d 445, 449 (5th Cir. 1995). It is Delta's burden, however, to show that the agency's decision is erroneous. See Mississippi Hosp. Assoc., v. Heckler, 701 F.2d 511, 516 (5th Cir. 1983) (noting that a "presumption of validity" attaches to agency action). The Board primarily justified its decision by charging that Delta failed to abide by the terms of the grant, and used grant funds as unrestricted support for its operation as a whole. Thus, Delta's efforts to show

19

that it maintained "effective control" over the funds are unpersuasive as this ground was not a primary basis for the Board's disallowance.

Additionally, we are not persuaded by Delta's assertion that only an inconsequential accounting difference exists between transferring funds as "paid-in-capital," rather than an equity investment. First, we note that this rather flamboyant conclusion is made without any supporting authority. Second, the record indicat es that in 1997 Delta scrambled to mislead auditors who questioned whet her a required equity investment in Delta Capital was ever made. It is not unreasonable to presume that if Delta truly regarded the difference between these two methods of transfer as inconsequential, then concealing the difference would not have been necessary.

Thus, we need not determine today whether failure to receive stock in exchange for funds surrendered to a subsidiary is alone a sufficient basis to support to the disallowance. Delta's failure to make the contemplated equity investment, when combined with its presentation of a false stock certificate to auditors, and total failure to support its assertion that the treatment of funds as "paid in capital" was inconsequential, lead us to conclude that Delta has not shown this disallowance to be arbitrary and capricious. See Mississippi Hosp. Assoc., v. Heckler, 701 F.2d 511, 516 (5th Cir. 1983) (noting that a "presumption of validity" attaches to agency action).

2. Administratively Dissolved Subsidiaries

As set forth in Delta's grant applications, Delta Enterprises and Delta Capital were to act as conduits through which grant money would flow to other Delta subsidiaries. Delta failed to disclose, however, that Rail Products, Fine Vines, Electro National, Action Communications, and Moeller Manufacturing -- subsidiaries integral to each grant project -- had been administratively dissolved by the State of Mississippi. It is undisputed that administratively dissolved entities may not engage in

20

activity unrelated to "winding up" their affairs. Thus, these corporate subsidiaries were unable to participate legally in the programs for which the grants had been given.

Delta downplays the significance of administrative dissolution by noting that dissolved corporations may seek reinstatement within five years and reinstatement is retroactive. Though Delta correctly notes that reinstatement reaches back to the date of administrative dissolution, many of the corporations at issue were beyond the five-year period for reinstatement at the time of the OIG audit in 1996. Further, each of these corporations was administratively dissolved at the time Delta submitted its grant applications. Thus, even if these corporations could have been reinstated at the time Delta filed its grant applications, it appears that Delta -- at the very least -- breached its duty to disclose in the grant applications any problems that could negatively affect the projects.

In our view, Delta's failure to disclose the dissolution of its subsidiaries, on its own, constitutes a material breach of the terms and conditions of Delta's award. These subsidiaries were unable to participate legally in Delta's grant programs at the time the funds were given. The mere possibility that these entities could have been re-instated within a five-year period does not make Delta's failure to disclose this information "immaterial." When viewing this behavior against the backdrop of Delta's efforts to mislead auditors and its other skullduggery, Delta has not persuaded this Court that the Board's disallowance was arbitrary and capricious.

*C. Delta's Failure To Safeguard Assets*

Delta channeled funds from the 1991 grant to Great River Spike. With $204,000 of grant funds, Great River Spike bought a spike-making machine to expand existing business activity. Unbeknownst to HHS, the spike-making machine became immediately encumbered through an after-acquired property clause related to a loan from AIDC. In relatively short order, the machine was

21

seized pursuant to this clause and sold via public auction for $85,000 to the manager of Great River Spike. The Board found that Delta failed to safeguard adequately grant assets and disallowed this expense. We review this conclusion to determine whether it was arbitrary and capricious.

In reaching its decision, the Board noted that Delta did not clearly disclose the existence of Great River Spike's loan from AIDC, Great River Spike's failure to make payments on the loan since 1990, and the existence of AIDC's after-acquired property clause. For the Board, it was "not unreasonable to presume" that had these facts been disclosed in Delta's grant application, OCS would have rejected the application, or found some way to safeguard assets destined for Great River Spike. Considering Delta's omissions regarding the loan, the Board indicated its belief that Delta had no authority to encumber the property. The Board also expressed concerns that Delta essentially squandered grant property on the risky proposition that the influx of grant capital might allow Great River Spike to pay down AIDC's loan.

Delta argues that, at most, HHS is entitled to fair market value of the equipment because Delta had legal title to the machine and disposed of it correctly pursuant to 45 C. F. R. § 74.34. Predictably, Delta asserts that $85,000 represents the fair market value of the spike machine.

HHS argues, consistent with the Board's opinion and applicable law, that Delta had an obligation to safeguard the property and to prevent it from being seized. See 45 C. F. R. § 74.140(c) (1991) (repealed 1994) (requiring recipients to maintain financial management systems that protect against loss, damage or theft of grant property);[4] § 74.61(c) (1991) (repealed 1994) (creating duty to safeguard property and assure that property is used solely for authorized purposes). Considering that the spike machine was subject to immediate seizure by AIDC because Great River Spike was in

---

[4] Where indicated, we review the 1991 regulations as applied by the DAB.

default on the loan, it is clear that Delta's actions do not square with its duty to safeguard grant assets. Further, given the inadequate disclosure of the defaulted loan, we believe that Delta had no right to encumber the spike machine.

Finally, it is worth addressing Delta's attempt to characterize the auction of the spike machine as an "orderly disposition" of an asset authorized by statute. It is true that dispositions of grant property may be proper pursuant to statute. Disposition is only appropriate, however, when the property is no longer needed for grant purposes, and it is sold in a competitive process with agency permission. 45 C. F. R. 74.34(g). In this case, Delta made no attempt to gain HHS permission for the sale, and even filed a false Property and Inventory Disposition Statement indicating that Great River Spike retained the spike machine. Given Delta's opaque disclosure of the AIDC loan, the unauthorized encumbrance and sale of grant property, and Delta's disregard for applicable regulations, we cannot conclude that the Board's decision was arbitrary and capricious.

*D. $97, 929 Disallowed as "Unneeded Equipment"*

In connection with the 1993 grant project Delta, through its subsidiary Greenville Apparel, used $129,753 in grant funds to purchase twenty-two pieces of sewing equipment. As required by Circular A-122, the Board considered whether this purchase of the sewing equipment was "reasonable for the performance of the award and allocable thereto." The Board found that only four pieces of this sewing equipment were used for grant purposes. The other eighteen pieces of sewing equipment were either used by Fine Vines, or sat idle. The auditors allotted $97,929 of the total purchase price to the unused equipment and the Board disallowed that portion of the expense.

In reaching its determination, the Board noted that a cost item is "reasonable" if "in its nature or amount, it does not exceed that which would be incurred by a prudent business person under the

23

circumstances prevailing at the time the decision was made to incur the costs." The Board recognized that when evaluating the "reasonableness" of an action "consideration must be given to various factors, including sound business practices and the terms and conditions of the awards." A cost is "allocable" to the grant, to the extent of the benefits received. Resolution of this issue did not turn on whether the *purchase price* was reasonable because Delta obtained a discount for purchasing the entire lot of equipment. Instead, the Board focused on whether the purchase was consistent with the terms of the award, the prudence of the purchase at the time made, and whether the purchase was intended to benefit the grant project or other cost objectives of Delta's related organizations.

Delta argued to the Board that the equipment purchase was in accordance with its business plan. The Board noted, however, that none of the 48 items of equipment listed in Delta's business plan correlated with the 22 pieces of equipment at issue. Further, the Board found that Delta offered no evidence or testimony, aside from baseless assertions, that this equipment would have been useful for the project. Finally, aside from an OIG finding that four pieces of equipment were used by Greenville Apparel, the Board concluded that no evidence in the record demonstrated the equipment purchase was a prudent business expenditure intended to benefit the Greenville Apparel project.

Delta challenges this disallowance on several grounds. First, Delta claims the government conceded the "reasonableness" of the equipment purchase. For Delta, this "concession" that the purchase of the equipment was proper, excuses Delta's failure to offer proof that the purchase was reasonable. As a basis for its claim, Delta cites an auditor's decision not to dispute that, "the equipment was purchased in anticipation of being used by Greenville Apparel for the purposes of the grant," and other language. Essentially, Delta claims that these comments gave it reason to believe that the issue of "reasonableness" was settled; therefore, "reasonableness" would not be challenged

24

before the Board.  As a corollary to this argument, Delta claims that the "reasonableness" of the purchase was never contested by HHS until its brief before the Board.

Even when viewed in isolation, the language cited by Delta falls woefully short of a "concession" that the purchase was reasonable.  Other language cited by Delta indicates that the auditor explicitly refused to comment on the "appropriateness" of the acquisition.  Moreover, our review of the record indicates that the equipment at issue was consistently characterized as "unneeded," and the auditor's report specifically noted Delta's failure to comply with Circular A-122, which contains the "reasonableness" standard at issue.

Delta next argues that the Board misconstrued the reasonableness standard contained within Circular A-122.  For Delta, the Board concluded "that a reasonably prudent person in Greenville Apparel's position would not have bought the subject equipment at the time Greenville Apparel purchased that equipment primarily because of the passage of NAFTA." In relevant part, the Board opinion states:

> Delta's contention that foreign competition contributed to the failure of this project also calls into question whether it was prudent to purchase the equipment in 1994. Delta acknowledged in its grant application that the possible passage of NAFTA could lead to the closure of domestic apparel plants in favor of plants in foreign countries with lower labor costs.  Yet, Delta decided to purchase the equipment in 1994 after Congress had approved NAFTA in December 1993.

Based on this excerpt, Delta believes that the Board disallowed this expenditure because Delta failed to predict accurately NAFTA's affect on rural, Southern garment manufacturing.

We do not read the DAB's opinion as demanding such a high-degree of prescience from Delta.  The opinion merely questions Delta's failure to reconsider its purchase after NAFTA's passage, in light of Delta's recognition that NAFTA could pose problems for the grant project.

Moreover, Delta's reliance on such a minuscule portion of the Board's opinion is misplaced, as this disallowance rests largely on the conclusion that Delta used grant funds to buy equipment for another subsidiary.

Finally, Delta claims that the Board overlooked evidence in order to disallow the purchase of this equipment. This sewing equipment was purchased as an indivisible lot from a failed business. Auditor notes reflect Harold Hall's assertion that the entire lot of machines was purchased to obtain the equipment sought by Greenville Apparel. Moreover, Hall told the auditor that purchasing the entire lot of used machines was less expensive than purchasing, as new, only that equipment needed by Greenville Apparel.

To pass the "arbitrary and capricious" test, the agency must give "at least minimal consideration to relevant facts contained in the record." State of Louisiana ex rel. Guste v. Verity, 853 F.2d 322, 327 (5th Cir. 1988). An agency need not respond to every stray comment in the record, however, in order to pass the "arbitrary and capricious" test. No documentation supports Hall's assertion that these unneeded machines were purchased without improperly depleting grant funds. Though the Board failed to specifically address Hall's comments, it is likely that the remarks were dismissed as unsupported and self serving. In our view, Hall's remarks do not provide a valid foundation for allowing this expenditure, or for a finding that the Board's decision on this point is arbitrary and capricious.

E. *Costs Disallowed For Inadequate Recordkeeping*

The Board found that Delta lacked documentation to support certain administrative and management fees claimed by Delta in connection with each of the four grants. The disallowed

26

expenses include $110,750 in administrative costs,[5] and $51,000 in management fees against the 1993 grant for services that Fine Vines allegedly supplied to Greenville Apparel.

In disallowing the expenses, the Board correctly noted that Delta shoulders the burden of demonstrating that the payments made relate to the terms of the grant. Lac Courte Oreilles Tribe, DAB No. 1132, at 5 n.4 (1990). To carry its burden, Delta submitted, inter alia, time sheets, cancelled checks, a check register and other records documenting the expenses and payments at issue.

First, the Board examined the disallowance of the management fees attributable to the wages and benefits of Delta's management.[6] After review of the evidence submitted, the Board rejected Delta's contention that time sheets and other records established an adequate nexus between the expenses and grant activities.

The Board next addressed the remaining $33,875 at issue. With respect to these costs, the Board concluded many of the documents submitted by Delta were illegible, or otherwise failed to elucidate exactly how they related to the grant projects. Our task is to consider whether disallowance of these expenses was arbitrary and capricious in light of the evidence submitted by Delta.

1. Travel Records Submitted By Delta

Delta submitted approximately one hundred pages of documentation in support of miscellaneous expenses relating to travel, supplies, meals and telephone charges. Despite this evidence, the Board disapproved these expenses. The Board noted that certain items might relate to grant projects, however, Delta failed to meet its burden of establishing that relationship.

---

[5] This disallowance includes $16,000 from the 1991 grant, $40,000 from the 1993 grant, $30,000 from the 1994 grant, and $24,750 in connection with the 1995 grant.

[6] This includes the $51,000 in management fees paid to Fine Vines under the 1993 Grant, and $76,875 of the $110,750 of administrative costs claimed by Delta in connection with all four grants.

On appeal, Delta focuses on travel records submitted in support of grant activity. Delta claims these records clearly list the dates and reasons for travel, and connect these travel expenses to grants. As an agency is not free to reach a conclusion simply by ignoring evidence contrary to that conclusion, see Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951), Delta claims that the Board's denial of these expenses "cannot stand" when juxtaposed with the evidence presented.

After reviewing the ream of documents submitted by Delta in support of these expenses, we agree with the Board: many of the documents submitted by Delta are illegible or are otherwise lacking in some material respect. For instance, the travel records cited by Delta do contain useful information regarding certain meetings, but they fail to relate the meetings to any particular grant. Other documents indicate the grant to be charged, but fail to indicate other crucial data. In short, Delta failed to document adequately this activity. Thus, we do not regard the Board's denial of these expenses as arbitrary and capricious.

2. Time Records & Greenville Apparel Management Fees

Next, Delta takes aim at the Board's disallowance of Greenville Apparel management fees. To support this expense, Delta submitted "time records" for five individuals. Delta argues that time records satisfy its evidentiary obligation in this case but the Board overlooked this evidence.

The applicable cost principles set forth in Circular A-122 require that costs must be "adequately documented." The Circular A-122 sets out the relevant guidelines for proper documentation of salaries and related expenses. In relevant part, the applicable Circular states the following:

> (1) Charges to awards for salaries and wages, whether treated as direct or indirect costs, will be based on documented payrolls approved by a responsible official(s) of the organization. The distribution of salaries and wages to awards must be supported

28

by personnel activity reports as prescribed in subparagraph (2) below, except where a substitute system has been approved in writing by the cognizant agency.

(2) Reports reflecting the distribution of activity of each employee must be maintained for all staff members (professionals and nonprofessionals) whose compensation is charged, in whole or in part, directly to awards . . . . these requirements must meet the following standards:

      (a) The reports must reflect the after-the-fact determination of actual activity of each employee. Budget estimates (i.e., estimates determined before the services are performed) do not qualify as support for charges to awards.

      (b) Each report must account for the total activity for which employees are compensated and which is required in fulfillment of their obligations to the organization.

      (c) The reports must be signed by the individual employee, or by a responsible supervisory official having first hand knowledge of the activities performed by the employee, that the distribution of activity represents a reasonable estimate of the actual work performed by the employee during the periods covered by the reports.

      (d) The reports must be prepared at least monthly and must coincide with one or more pay periods.

Thus, to satisfy the requirements of the OMB Circular, a grantee must produce records showing the amount of time each employee devoted to activities associated with the grant project.

Delta argues that under Anishinaubag Intercultural Program, DAB No. 1477 (1984), the time records submitted are adequate support for this expense. In Anishinaubag, a non-profit grantee sought to claim the salaries of certain construction workers against the grant. During the course of the proceedings before the Board, the agency allowed those salaries for which the grantee supplied time records.

Noting that time records were the most direct means of establishing the number of hours worked, the Board held that time records were not per se required by the Circular. Substitute documentation, however, must meet the regulatory requirement that the grantee document "the total number of hours worked each day."

In Anishinaubag, only one grant was at issue. Further, there is no indication that the grantee in Anishinaubag sat atop a sophisticated corporate structure comprised of numerous subsidiaries. Most importantly, however, Anishinaubag did not involve the time sheets of employees who juggled grant-related activities with activities unrelated to the grant. Thus, we view Anishinaubag as inapposite.

In this case, Delta submitted time records for Harold Hall apparently in his capacity as the Chief Executive in charge of management of Greenville Apparel. In addition to performing this post, however, Mr. Hall served as the project manager for three of the grants at issue, and the Chief Operating Officer of Delta Enterprises, Inc. The four other individuals for whom Delta submitted time sheet were primarily employed by Fine Vines, not Greenville Apparel.

Because these individuals were employed by several Delta entities, it was reasonable for the Board *not* to presume that all work reflected in the time sheets related to grant activity. To state the obvious: even time sheets may be unsatisfactory documentation if they fail to link an employee's labor to grant-related activities. The time sheets presented by Delta do not indicate what portion of the documented time applies to grant activities. Thus, Delta's "representation" that the time sheets accurately reflect grant-related activity stands as the only evidence for this conclusion.

As the Board correctly noted, the Circular requires that Delta supply time records reflecting "the distribution of activity of each employee" and "account for the total activity for which employees are compensated." It is not enough for a cost to be allowable, records must establish that the cost is also allocable to the grant project. The Board's refusal to accept Delta's "good word" in place of the required documentation is certainly not arbitrary and capricious. As such, we see no reason to disturb any part of the Board's decision regarding fees or miscellaneous expenses.

30

## V.  Conclusion

For the foregoing reasons, we AFFIRM the DAB's decision.