# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-50497

United States Court of Appeals
Fifth Circuit

**FILED**

June 10, 2016

Lyle W. Cayce
Clerk

ASSOCIATED BUILDERS AND CONTRACTORS OF TEXAS,
INCORPORATED; ASSOCIATED BUILDERS AND CONTRACTORS,
INCORPORATED CENTRAL TEXAS CHAPTER; NATIONAL
FEDERATION OF INDEPENDENT BUSINESS/TEXAS,

> Plaintiffs - Appellants

v.

NATIONAL LABOR RELATIONS BOARD,

> Defendant - Appellee

Appeal from the United States District Court
for the Western District of Texas

Before CLEMENT and HAYNES, Circuit Judges, and GARCIA
MARMOLEJO, District Court.\*

EDITH BROWN CLEMENT, Circuit Judge:

Appellants, Associated Builders and Contractors of Texas, Inc., its
chapter member, the Central Texas Chapter of ABC of Texas, and the National
Federal of Independent Business/Texas (collectively, the "ABC entities"), are
Texas-based trade and advocacy associations that represent construction
employers and small business owners. The ABC entities brought a facial

---

\* District Judge of the Southern District of Texas, sitting by designation.

No. 15-50497

challenge to enjoin enforcement of a final rule issued by the National Labor Relations Board (the "Board" or "NLRB") that modifies procedures relating to union representation elections. Because the new rule, on its face, does not violate the National Labor Relations Act or the Administrative Procedure Act, we AFFIRM.

## I.

The challenged NLRB rule amended the procedures for determining whether a majority of employees wish to be represented by a labor organization for purposes of collective bargaining.[1] *See* Representation—Case Procedures, 79 Fed. Reg. 74308–10 (Dec. 15, 2014). Intended to decrease the time preceding union elections, the rule allows for employees to take a vote on union representation as soon as eleven days after a petition for representation is filed. Among other changes, the rule defers employer challenges to voter eligibility issues until after an election is held; removes the standard twenty-five day delay that normally occurs between the time a regional director directs an election and the actual election; and requires expanded disclosure of employee contact information.

Before the rule became effective, the ABC entities filed this action, arguing that the rule exceeds the Board's statutory authority under the National Labor Relations Act ("the Act" or "NLRA") and violates the Administrative Procedure Act ("APA"). The ABC entities, in a motion for summary judgment, requested that the district court vacate the rule changes

---

[1] A previous version of this rule, which enacted similar changes to the representation election process, was held invalid on the ground that the NLRB acted without the requisite quorum. *Chamber of Commerce of U.S. v. NLRB*, 879 F. Supp. 2d 18 (D.D.C. 2012). Although the rule was challenged on "myriad grounds," the court did "not reach—and express[ed] no opinion on—Plaintiffs' other procedural and substantive challenges to the rule." *Id*. at 30.

No. 15-50497

as facially invalid and enjoin enforcement.[2] In response, the Board filed a combined partial motion to dismiss and cross-motion for summary judgment, contending that deference is owed to decisions of the Board and that the rule changes are reasonable and consistent with the NLRA and the APA. The district court ruled in favor of the Board, and this appeal followed.[3]

## II.

We review *de novo* a district court's grant of summary judgment, "applying the same standard as the district court." *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 717 (5th Cir. 2013). We analyze an agency's interpretation of its authorizing statute using the two-step procedure set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). First, we ask "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If it has, "that is the end of the matter," and we "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. If it has not, we defer to the agency's reasonable interpretations of the statute. *See NLRB v. Ky. River Cmty. Care, Inc.,* 532 U.S. 706, 713 (2001).

The APA also authorizes us to set aside agency actions if "arbitrary, capricious, an abuse of discretion" or otherwise "not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010); *see* 5 U.S.C. §

---

[2] On appeal, the ABC entities make several passing references to "as-applied challenges" to the new rule. Their complaint, however, states that it presents a facial challenge to the rule. The ABC entities filed their complaint on January 13, 2015, months before the rule became effective. Based on this, and the language of their complaint, the district court determined that they had brought a facial challenge to the rule. The ABC entities cannot raise an as-applied challenge now. *See Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1288 (5th Cir. 1997). We express no opinion on the merits of any such as-applied challenge.

[3] A parallel challenge to the final rule in the United States District Court for the District of Columbia has also been resolved in the Board's favor. *Chamber of Commerce of U.S. v. NLRB*, No. 15-0009, 2015 WL 4572948 (D.D.C. July 29, 2015).

No. 15-50497

706(2). Our task is to determine whether the agency examined the pertinent evidence, considered the relevant factors, and articulated a "reasonable explanation for how it reached its decision." *Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 410 (5th Cir. 1999); *see Motor Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This standard is highly deferential; we apply a presumption of validity. *Tex. Clinical Labs, Inc.*, 612 F.3d at 775. We may not substitute our judgment for that of the agency. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).

Because the ABC entities bring a facial challenge, they "must establish that no set of circumstances exists under which the [Rule] would be valid." *Center for Individual Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see Sherley v. Sebelius*, 644 F.3d 388, 397 (D.C. Cir. 2011) (applying the "no set of circumstances" test to a facial statutory challenge); *Scherer v. U.S. Forest Service*, 653 F.3d 1241, 1243 (10th Cir. 2011) ("To prevail in this and any facial challenge to an agency's regulation, the plaintiffs must show that there is 'no set of circumstances' in which the challenged regulation might be applied consistent with the agency's statutory authority." (quoting *Reno v. Flores*, 507 U.S. 292, 301 (1993))).

III.

The NLRA grants employees the right "to bargain collectively through representatives of their own choosing . . . and to . . . refrain from . . . such activities." 29 U.S.C. § 157. Section 9 of the Act gives the Board authority to resolve questions of representation, and sets forth the basic steps for that process. When a petition for representation is filed, the Board is required to investigate the petition and "provide for an appropriate hearing upon due notice" before the election is held. *Id.* § 159(c)(1). The hearing "may be conducted by an officer or employee of the regional office, who shall not make

4

any recommendation with respect thereto." *Id.* A union may represent employees in collective bargaining if the union is "designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes." *Id.* § 159(a). In each case, "the Board shall decide" the "unit appropriate for the purposes of collective bargaining" in order to "assure to employees the fullest freedom in exercising the rights guaranteed by [the Act]." *Id.* § 159(b).

Aside from these general requirements, the statute says little about specific procedures for processing election petitions. The Board has authority to proscribe rules for processing such petitions, 29 U.S.C. §§ 156, 159(c)(1), and has repeatedly amended these procedures, usually without notice and comment. 79 Fed. Reg. 74310. Here, the final rule followed an extensive comment period, totaling 141 days and four days of hearings. *Id.* at 74,311. Overall, the Board implemented twenty-five amendments to the procedures for processing representation petitions. 79 Fed. Reg. 74,308–10. For purposes of this appeal, the provisions challenged by the ABC entities fall into three categories: (1) rule changes that limit the scope of the pre-election hearing, particularly the deferral of individual voter eligibility issues; (2) rule changes that require employers to disclose to unions personal-employee information; and (3) rule changes that cumulatively shorten the time period between petition and election to less than thirty days.

A.

The ABC entities contend that the rule exceeds the Board's authority under Section 9 of the Act by allowing regional directors to preclude employers from contesting voter eligibility issues in pre-election hearings. The Board argues that the Act's requirement that the Board hold an "appropriate hearing" on questions of representation does not demand pre-election litigation of all voter-eligibility issues. The Board has the better argument.

No. 15-50497

Section 9 of the NLRA states that "[t]he Board shall decide in each case . . . the unit appropriate for the purposes of collective bargaining." 29 U.S.C. § 159(b). The Act mandates that the Board investigate representation petitions "and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice." *Id.* § 159(c)(1).

Prior versions of the regulations neither expressly stated the purpose of the hearing nor specifically limited the evidence that could be introduced. *See* 29 C.F.R. § 102.66(a) (replaced effective April 14, 2015); 79 Fed Reg. at 74,309 (stating that prior rules "required . . . litigation of any voter eligibility issues that any party wished to litigate, even if the regional director was not going to be deciding that question, and even if the particular voter eligibility question was not necessary to resolving the existence of a question of representation"). In the new rule, the Board addressed the administration of the pre-election hearing and emphasized that the purpose of the hearing "under Section 9(c) of the [NLRA] is to determine if a question of representation exists." 29 C.F.R. § 102.64(a).[4] Employers are now required to submit a written "Statement of Position" that identifies any basis for contending that the proposed bargaining unit is inappropriate, any challenges to voter eligibility, and "all other issues the employer intends to raise at the hearing." 29 C.F.R. § 102.63(b)(1)(i). In accordance with the rule's purpose, however, hearing officers and regional directors may decline to hear evidence on issues "that need not be decided before the election," including issues of individuals' eligibility to vote. 79 Fed. Reg. 74,384; *see also* C.F.R. § 102.64(a) ("Disputes concerning individuals'

---

[4] A question of representation exists "if a proper petition has been filed concerning a unit appropriate for the purpose of collective bargaining or concerning a unit in which an individual or labor organization has been certified or is being currently recognized by the employer as the bargaining representative." 29 C.F.R. § 102.64(a).

eligibility to vote or inclusion in an appropriate unit ordinarily need not be litigated or resolved before an election is conducted."). But even if a voter's eligibility or inclusion is not contested at the pre-election hearing, a party may later challenge the eligibility of any voter. *Id.* § 102.66(d).

Objecting to the new provisions, the ABC entities argue that these rule changes impermissibly restrict the scope of the pre-election hearing, particularly by limiting the right of employers to contest issues of voter eligibility. Relying on the legislative history of the Taft-Hartley amendments to the NLRA and remarks of Senator Taft,[5] they maintain that the "function of hearings in representation cases [is] to determine whether an election may be properly held at the time, and if so, to decide questions of unit and eligibility to vote."[6] In other words, the ABC entities argue that the legislative history mandates that employers be allowed to contest all issues of unit appropriateness and voter eligibility at pre-election hearings. By impermissibly preventing employers from litigating these issues at the hearings, the ABC entities argue, the rule violates the purpose of Section 9 and therefore is an unreasonable interpretation of the statute.

But this reading of the rule and the legislative history is unpersuasive. The actual language of the rule neither "precludes" nor "prevents" the

---

[5] The ABC entities cite, in support of this point, a single sentence by Senator Taft contained in a supplemental analysis produced after the Act was passed. *But see Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979) (finding that "[t]he remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history").

[6] To this point, the ABC entities cite earlier Board decisions, including *Barre-National, Inc.*, 316 N.L.R.B. 877, 878 n.9 (1995), which held that Section 9(c) entitled employers to contest individual voter eligibility in a pre-election hearing. The Board contends, in response, that in making the present rule change it explicitly overruled *Barre-National* and notes that *Barre-National* failed to analyze the relevant statutory language and legislative history. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 787 (1990) (noting that "a Board rule is entitled to deference even if it represents a departure from the Board's prior policy" as long as it is "rational and consistent with the Act").

presentation of evidence regarding voter eligibility. The rule simply indicates that "[d]isputes concerning individuals' eligibility to vote or inclusion in an appropriate unit *ordinarily* need not be litigated or resolved before an election is conducted." 29 C.F.R. § 102.64(a) (emphasis added); *see* 79 Fed. Reg. at 74,390 (explaining that the Board "expect[s] regional directors to permit litigation of, and to resolve, [individual eligibility or inclusion] questions when they might significantly change the size or character of the unit"). The rule does not speak to the inclusion of groups or classifications of employees; it provides only that disputes concerning "individual's" eligibility or inclusion will be deferred. 29 C.F.R. § 102.64(a). Regional directors are provided the discretion to defer consideration of individual voter eligibility. The rule neither eliminates the possibility that a hearing officer could address these issues at an earlier stage nor prohibits an employer from ever raising such issues. *See* 29 C.F.R. § 102.66(d).

The ABC entities fail to identify any statutory language or legislative history that requires litigation of *all* voter eligibility at the pre-election hearing. The statute does not demand a hearing on all issues affecting the election, or even all substantial issues affecting the election. Section 9 specifies that the purpose of the pre-election hearing is to determine whether a question of representation exists, which is a different inquiry from the question of which specific individuals will vote in the ensuing election. The ordinary meaning of the statutory language cannot support the ABC entities' construction. *See Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994) (explaining that courts do "not resort to legislative history to cloud a statutory text that is clear").

In support of its argument that the rule conforms to the statutory text, the Board points to *Inland Empire District Council, Lumber & Sawmill Workers Union v. Millis*, 325 U.S. 697, 706 (1945). The Supreme Court, in *Inland Empire*, interpreted Section 9 to grant the Board wide discretion in

devising the procedures employed in deciding whether a question of representation exists. The Court explained that the phrase "appropriate hearing upon due notice" is deliberately expansive and noted that Congress intended to "confer[] broad discretion upon the Board as to the hearing which [Section] 9(c) required before certification." *Id.* at 708; *see  NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330 (1946) ("Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees.").

The ABC entities counter that *Inland Empire* preceded the Taft-Hartley amendments, which "fundamentally rewrote the *entire section of the Act* in which the hearing requirement appears." The "appropriate hearing" language, however, remained the same pre- and post-amendment. In the absence of any change to the phrase, the Court's interpretation remains controlling. *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998); *see also Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 988 (7th Cir. 2001) ("If a phrase or section of a law is clarified through judicial construction, and the law is amended but retains that same phrase or section, then Congress presumably intended for the language in the new law to have the same meaning as the old.").

Moreover, because this is a facial challenge, the ABC entities must demonstrate that the provisions would not be valid under any set of circumstances. Contrary to the ABC entities' contention, the Board's rule provides regional directors discretion to determine voter eligibility issues in pre-election hearings. Regional directors can postpone the time for submitting a Statement of Position on a showing of either special or extraordinary circumstances. 29 C.F.R. § 102.63(b)(1). And if they determine that certain record evidence is necessary, regional directors can "direct the receipt of evidence concerning any issue." *Id.* § 102.66(b). Because the rule changes to

No. 15-50497

the pre-election hearing did not exceed the bounds of the Board's statutory authority under the NLRA, we affirm.

B.

The ABC entities also challenge provisions of the rule that require disclosure of personal-employee information both before and after the pre-election hearing. They argue that the provisions conflict with federal privacy law and thus constitute an impermissible interpretation of the NLRA. And they assert that the broader disclosure requirements are an arbitrary and capricious invasion of the privacy rights of employees in violation of the APA. The Board maintains that the disclosures are consistent with the purpose of the NLRA, and asserts that it carefully weighed the privacy rights of employees in accordance with the requirements of the APA. Because the NLRA does not prohibit these disclosures and because the Board offers a rational explanation for its decision, we defer to it.

The NLRA directs the Board to decide the "unit appropriate for the purposes of collective bargaining" so as to "assure to employees the fullest freedom in exercising the rights guaranteed by [the Act]." 29 U.S.C. § 159(b). Employees are also granted the "right" to "refrain from" engaging in union activity. *Id.* § 157. In its *Excelsior Underwear, Inc.* decision, the Board first required an employer to disclose the names and addresses of employees eligible to vote in representation elections. 156 N.L.R.B. 1236 (1966). The Board found that a lack of information in a representation election impedes employee's exercise of choice and determined that providing employee's personal information maximizes the "likelihood that all the voters will be exposed to the arguments for, as well as against, union representation." *Id.* at 1240–41. Upholding the validity of the disclosure rule, the Supreme Court endorsed this rational in *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 767 (1969) ("The disclosure requirement furthers this objective [to ensure the fair and free

10

No. 15-50497

choice of bargaining representatives] by encouraging an informed employee electorate and by allowing unions the right of access to employees that management already possesses.").

Here, the new disclosure provisions expand *Excelsior Underwear* by requiring two separate disclosures of employee information. First, within two days of a direction of election, employers must produce a voter list that contains "the full names, work locations, shifts, job classifications, and contact information (including home addresses, available personal email addresses, and available home and personal cellular ('cell') telephone numbers) of all eligible voters." 29 C.F.R. § 102.67(l). Employers must disclose this information about all employees who are deemed to be part of an appropriate bargaining unit, as well as those employees whose status is not yet determined. *Id.* §§ 102.62(d) & 102.67(l). Under the prior rule, employers were required only to produce a list of names and addresses within seven days of the direction of an election. *Excelsior Underwear*, 156 N.L.R.B. at 1239–40. Second, employers must disclose the names and job duties of employees to a petitioning union before any determination that the petition is supported by a sufficient showing of interest to proceed to an election. *Id.* § 102.63(b). Notably, however, before disclosing employee information to a union, the regional director must find that there is "reasonable cause to believe" that a question of representation exists. 29 C.F.R. § 102.63(a)(1).

1.

The ABC entities assert that these requirements conflict with federal laws that protect employee privacy. They suggest that federal law has moved away from *Excelsior Underwear*'s justification for disclosure and towards increasing privacy protections, citing, as support, the Privacy Act, the privacy exemption to the Freedom of Information Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, and the Controlling the Assault

11

No. 15-50497

of Non-Solicited Pornography and Marketing Act. And they note generally that the disclosure requirements are "at odds" with congressional intent to "limit the number of intrusions into individual privacy." They fail, however, to identify any federal law that restricts the disclosure of employee information to unions by employers. They similarly fail to note any change in circumstances that would undermine the Board's concern for encouraging an informed employee electorate by allowing unions the right of access to employees. *See Wyman-Gordon Co.*, 394 U.S. at 767 (concluding that the Board was within its authority to order disclosure of employee information). Because the disclosure requirements reasonably further this valid objective, the rule change does not violate the NLRA.

2.

The ABC entities also contend that the disclosure provisions are arbitrary and capricious under the APA because the rule disregards employees' privacy concerns, exposes employees to union intimidation and harassment, enables union misuse of the voter list, and imposes a substantial burden on employers. They insist that employees' privacy rights "should outweigh the desire of unions to use the latest technology to facilitate their organizing efforts." But on review of agency decisions under the arbitrary and capricious standard, we cannot substitute our judgment or preferences for that of the agency. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). To affirm an agency's action, we need only find a rational explanation for *how* the Board reached its decision. *See Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 410 (5th Cir. 1999).

The rule changes adopted by the Board were "intended to better advance the two objectives articulated by the Board in *Excelsior*"; namely, to ensure fair and free choice by maximizing voter exposure to nonemployer party arguments and to resolve questions of representation by facilitating knowledge of voters'

12

identities. 74 Fed. Reg. at 74,335. As an initial matter, the ABC entities contend that the disclosure requirements place an undue, substantial burden on employers. In adopting the rule, the Board considered comments that the two-day turnaround was impractical and unduly burdensome. 79 Fed. Reg. 74,353. The Board concluded, however, that "advances in recordkeeping and retrieval technology" warranted reducing the time period for production of the voter list. *Id.* Noting that federal employment law already requires businesses to maintain employee records, the Board also pointed out that the regional director may "direct a due date for the voter list beyond two days in extraordinary circumstances." *Id.* at 74,354. Because the rule accords such deference to the regional director, the ABC entities' facial challenge to the turnaround time fails.[7]

The ABC entities next charge that disclosure of personal information provides increased opportunity for union abuse and misconduct. But the language of the rule accounts for that concern, mandating that the parties "shall not use the [voter] list for purposes other than representation proceeding, Board proceedings arising from it, and related matters." 29 C.F.R. §§ 102.62(d) & 102.67(l); *see also* 79 Fed. Reg. 74,358 (listing when employees' personal information may be used and cautioning that the information may not be used to "harass, coerce, or rob employees"). Moreover, the Board noted several remedial options for union misconduct, and concluded that it would continue to leave the "question of remedies to case-by-case adjudication." 79 Fed. Reg. 74,359.

---

[7] The Board's conclusion that technological advances make a two-day time period reasonable provides a framework for determining future requests for additional time or controversies over failure to provide information kept in other formats in the regular course of business or not readily accessible to the employer.

No. 15-50497

With regard to the employee privacy concerns, the Board reviewed the "revolution in communications technology" between when *Excelsior* was decided and the present day. The Board cited evidence of the decline in traditional means of communication—including United States mail and "face-to-face conversations on the doorstep"—and analyzed the increasing use of digital communications technology, observing that home and cellular phones, as well as email, have become "a universal point of contact." *Id.* at 74,337. The Board considered "employee privacy concerns" and weighed the benefits of expanding disclosure of voter contact information against the privacy risk. The Board acknowledged the privacy risks associated with the use of cell phones and emails and agreed that "[employees] have [a] nontrivial privacy interest in nondisclosure of home address information." *Id.* at 74,342. As the Board explained, however, the privacy risks associated with this disclosure is "part of our daily life," and requires only the release of information that the employee has already shared with his or her employer. *Id.* at 74,343 n.169.

The ABC entities predict that disclosure of such information exposes employees to identity theft. But the ABC entities fail to identify any evidence that disclosure of an email address and a cell phone number presents either a greater risk of identity theft or a greater possibility of privacy infringement than a home address. Indeed, virtual contact in the form of a phone call or email is routinely and readily ignored. Face-to-face contact with a union representative at an employee's home is significantly more intrusive and more difficult to avoid. And as an additional precaution, the voter list information is not available to the public at large, but is provided only to a limited set of recipients. *Id.* at 74,344.

Again, as this is a facial challenge, the ABC entities carry the burden of demonstrating that no set of circumstances exists under which this regulation would be valid. Exposing employees to a potentially increased risk of identity

14

No. 15-50497

theft and data breach so as to ensure an informed electorate does not rise to the level of arbitrary and capricious agency action. We may favor greater privacy protections over disclosure, but it is within the Board's discretion to weigh competing interests and promulgate rules that advance the goals of the Act. Its reasoning is not irrational and it is not the province of this court to inject a contrary policy preference. The Board extensively considered the burden on employers and the privacy concerns of employees when determining the necessity of the expanded disclosure requirements.[8] The expanded disclosure regime is rationally connected to the transformative changes in communications technology, and the Board's rule was not arbitrary and capricious. *See NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 266 (1975) (remarking that the Board is entrusted with "[t]he responsibility to adapt the [NLRA] to changing patterns of industrial life").

## C.

The ABC entities also argue that the rule violates the NLRA by interfering with protected speech during election campaigns. They contend that the cumulative effect of the rule change improperly shortens the overall pre-election period in violation of the "free speech" provision of the Act.

The NLRA protects the rights of both employers and employees to engage in "uninhibited, robust, and wide open debate in labor disputes." *Chamber of Commerce of U.S. v. Brown*, 554 U.S. 60, 67–68 (2008) (reviewing Section 8(c) of the NLRA, 29 U.S.C. § 158(c)). Prior versions of the regulations stated that the regional director "will normally not schedule an election until a date between the 25th and 30th days after the date of the decision, to permit the

---

[8] "[W]e have concluded that employees' legitimate interest in the confidentiality of their personal email addresses and phone numbers is outweighed by the substantial public interest in disclosure where, as here, disclosure is a key factor in insuring a fair and free election and an expeditious resolution of the question of representation." 79 Fed. Reg. 74349.

No. 15-50497

Board to rule on any request for review which may be filed." 29 C.F.R. § 101.21(d) (2014). Under the new rule, "[e]lections will no longer be automatically stayed in anticipation of requests for review," 79 Fed. Reg. at 74,309, and instead, "[t]he regional director shall schedule the election for the earliest date practicable" consistent with the NLRA and the relevant regulations. 29 C.F.R. § 102.67(b).

1.

Again relying on legislative history, the ABC entities point to the 1959 amendments to the Act to demonstrate congressional opposition to "quickie" union elections. They point to comments by then-Senator John F. Kennedy, sponsor of the 1959 bill, declaring the necessity of a 30-day waiting period as a "safeguard against rushing employees into an election." Notably absent from their argument, however, is any citation to a provision of the Act or other statute that mandates a specified waiting period prior to an election. This court refers to legislative history only when the statutory text is ambiguous. *See Rainbow Gun Club, Inc. v. Denbury Onshore, LLC*, 760 F.3d 405, 410 (5th Cir. 2014). This statutory text is unambiguous on its face, so we need not refer to legislative history to discern its meaning. *See Ratzlaf*, 510 U.S. at 147–48. Because the statutory text is unambiguous, the ABC entities' citations to legislative history are unpersuasive.

2.

Moreover, to the extent the ABC entities argue that the timing provisions violate the APA, they fail to explain how or why—aside from repeatedly characterizing the elections as "quickie elections"—the rule change inhibits meaningful debate or qualifies as arbitrary and capricious. In declining to create a specific deadline for elections, the Board addressed concerns about impairing speech rights. The Board found that many employers begin speaking to employees about union representation well before a petition

16

No. 15-50497

is filed, "often as soon as [the employees] are hired." 79 Fed. Reg. 74,320–21; *see NLRB v. Gissel Packing Co.*, 395 U.S. 575, 603 (1969) (recognizing that union organizing campaigns rarely catch employers unaware). And as the Board pointed out, employers "can compel attendance at meetings at which employees are often expressly urged to vote against representation." 76 Fed. Reg. 74,323. The Board also charged regional directors, in setting the election, with taking into account "the desires of the parties, which may include their opportunity for meaningful speech about the election." *Id.* at 74,318. This discretion afforded to the regional director effectively precludes the ABC entities' facial challenge. The ABC entities cannot show that an impermissible burden on speech exists in every set of circumstances. Because the Board considered the potential burdens on speech and afforded the regional director discretion in setting an election date, the ABC entities' challenge to the timing rule fails.

D.

Finally, the ABC entities contend that the rule—viewed as a single, comprehensive change—is invalid because the Board acted arbitrarily and capriciously in violation of the APA. Reframing their earlier arguments, the ABC entities contend that the rule is arbitrary and capricious because it is based on factors that Congress did not intend the Board to consider, including speed in scheduling elections, delay of voter eligibility issues, disclosure of employee information, and facilitation of organized labor.

The Board agrees that it considered speed in scheduling elections. But increasing the efficiency and effectiveness of regulatory programs is well within the Board's purview. *See Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1340 (2013) (Scalia, J., concurring in part, dissenting in part) ("Making regulatory programs effective is the purpose of *rulemaking*."); *Abbott Ambulance of Ill. v. NLRB*, 522 F.3d 447, 451 (D.C. Cir. 2008) (noting that the

Board rule promoted efficiency in union elections and finding that the Board could reasonably weigh delay and uncertainty in election results in altering rules); *NLRB v. Cedar Tree Press, Inc.*, 169 F.3d 794, 798 (3d Cir. 1999) (sanctioning the Board's policy choice regarding absentee ballots and noting the validity of considering delay in the election process).

The Board also reasoned that the final rule was necessary to further a variety of additional permissible goals and interests. 79 Fed. Reg. 74,315. In adopting these changes, the Board explained that the rule was designed not only to increase the speed and efficiency of the election process, but also to reduce unnecessary barriers to elections, to modernize processes so as to reduce cost, and to "make effective use of new technology." *Id*. These goals all further the Board's mandate to "adopt policies and promulgate rules and regulations in order that employees' votes may be recorded accurately, efficiently, and speedily." *A.J. Tower, Co.*, 329 at 331. And the ABC entities' allegations of other impermissible considerations—delay in deciding voter eligibility issues, disclosure of employee information, and assistance of organized labor—are unsupported by the record. The ABC entities point to nothing in the record that indicates these were factors considered by the Board rather than simply the resulting means by which the Board pursued its previously identified goals.

Next, the ABC entities claim that the Board failed to consider important aspects of the alleged problem with the speed of elections. They argue that the Board's failure to address blocking-charge delays to elections is a "strong indicator that the asserted reasons for accelerating other aspects of pre-election procedures . . . are pretextual." Blocking charges are unfair labor practice charges filed concurrent to petitions for representation elections by

18

unions in order to delay a vote.[9] *See* 79 Fed. Reg. 74455. But the Board directly considered the delays caused by blocking charges, and modified current policy in accordance with those considerations. *Id.* at 74,418–19; 29 C.F.R. § 103.20 (requiring that a party who files an unfair labor practice charge simultaneously file a "written offer of proof in support of that charge"). The ABC entities also accuse the Board of failing to adequately consider the likelihood that increased deferral of pre-election issues to post-election challenges will increase the overall time required to certify union representatives. But the record refutes their unsubstantiated and conclusory assertion. The Board considered evidence that more than 70% of elections in 2013 were decided by a margin greater than 20% of all unit employees, "suggesting that deferral of up to 20% of potential voters . . . would not have compromised the Board's ability to immediately determine election results in the vast majority of cases." Accordingly, the deferral provision may render certain issues moot, resulting in reduced litigation.

As a last-ditch effort, the ABC entities complain that representation elections were delayed in only a small number of cases and there was "no demonstrated need to make the sweeping changes adopted by the Board." But an agency does not act in an arbitrary and capricious manner simply because it attempts to improve a regulatory scheme. "[I]f the agency considers the factors and articulates a rational relationship between the facts found and the choice made" and gives "at least minimal consideration to relevant facts

---

[9] Under Board policy, processing of a petition is abated "where a concurrent unfair labor practice charge is filed by a party to a petition and the charge alleges conduct that, if proven, would interfere with employee free choice in an election, were one to be conducted." 79 Fed. Reg. 74,455. *See Bishop v. NLRB*, 502 F.2d 1024, 1029 (5th Cir. 1974) (citing approval for the blocking charge rule as a means of preventing employers from profiting by wrongdoing, *i.e.*, "committ[ing] unfair labor practices and . . . thereby succeed[ing] in undermining union sentiment").

contained in the record," it is not the role of the court "to weigh the evidence pro and con." *Delta Found., Inc. v. United States*, 303 F.3d 551, 563 (5th Cir. 2002). Here, the Board identified evidence that elections were being unnecessarily delayed by litigation, *see* 79 Fed. Reg. 74,317–18, and that certain rules had become outdated as a result of changes in technology, *see id.* at 74,308. It conducted an exhaustive and lengthy review of the issues, evidence, and testimony, responded to contrary arguments, and offered factual and legal support for its final conclusions. Because the Board acted rationally and in furtherance of its congressional mandate in adopting the rule, the ABC entities' challenge to the rule as a whole fails.

IV.

For the reasons explained, we AFFIRM the district court. We reiterate the high burden faced by the ABC entities in this facial challenge, and we hold that the challenged provisions of the Board's rule neither exceed the scope of its authority under the NLRA nor violate the APA's arbitrary and capricious standard.