# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 22, 2024

Lyle W. Cayce
Clerk

No. 23-30085

Holy Cross College, Incorporated, *doing business as* Holy Cross School,

*Plaintiff—Appellant*,

*versus*

Deanne Criswell, *in her capacity as Administrator of* the Federal Emergency Management Agency; Federal Emergency Management Agency,

*Defendants—Appellees.*

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:21-CV-1658

_____

Before Elrod, Willett, and Duncan, *Circuit Judges*.

Per Curiam:[*]

Following Hurricane Katrina, the Federal Emergency Management Agency ("FEMA") approved public assistance funding to Holy Cross College so that it could replace its destroyed campus. FEMA later disallowed, or "deobligated," some of that funding because, in its view, Holy Cross spent

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

it on ineligible improvements to its campus and failed to follow federal contract-procurement requirements. After it lost two agency appeals, Holy Cross filed suit against FEMA and its administrator, Deanne Criswell, in federal court arguing that the agency acted arbitrarily and capriciously. The district court granted summary judgment for FEMA. Because we agree that Holy Cross is not statutorily protected from deobligation, and because FEMA's decisions were not arbitrary and capricious, we AFFIRM.

I

Holy Cross is a 174-year-old private middle and high school for boys in New Orleans, Louisiana. In August 2005, flood waters and high winds from Hurricane Katrina destroyed the school's historic campus in the Ninth Ward. Because of this damage, Holy Cross was eligible for public-assistance grant funding to replace its facilities under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121–5207.

Following the storm, FEMA provided public-assistance grant funding to the State of Louisiana Governor's Office of Homeland Security and Emergency Preparedness ("GOHSEP"). From this grant, private nonprofits like Holy Cross, state agencies, and local governments were eligible to apply for subgrant funding to rebuild their facilities. Holy Cross submitted applications called project worksheets ("PWs") to FEMA for funding to replace four of the school's flood-damaged campus buildings: the High School (PW 12965), Middle School (PW 13237), Central Services Plant (PW 13136), and Administration Building (PW 13333). Holy Cross also constructed a temporary campus, which opened in January 2006.

FEMA approved these requests and obligated grant funding based on the estimated cost of the eligible scope of work for the project. This obligated money was to be paid on a reimbursement basis, in which Holy Cross would submit eligible costs for reimbursement. In its approval, FEMA explained

the limitations on the uses of federal funding. In its Central Services Plant approval, for example, FEMA explained that the project qualified for "replacement," meaning that federal funding would cover the reasonable costs to replace the building to its pre-disaster state. The Central Services Plant was not eligible, however, for improvements beyond what was required to replace the original building, and FEMA explained that any costs associated with improvements to the building would become Holy Cross's responsibility. FEMA also explained that its approval documents contained only estimates of reasonable costs, and that the final federal share of costs would be determined at the project's closeout when adjustments would be made for unreasonable costs or costs associated with improvements.

In its approval, FEMA also gave Holy Cross permission to rebuild its campus in a new location, the Gentilly neighborhood of New Orleans. Construction began there in 2008. Holy Cross completed construction of the Middle and High School buildings in 2009, the Administration Building in 2010, and the Central Services Plant in 2011.

In 2015 at the projects' closeout, the Department of Homeland Security's Office of Inspector General completed an audit of Holy Cross's receipt of $89.3 million in federal funding from FEMA under the Stafford Act. The audit concluded that Holy Cross did not follow federal procurement standards in awarding 21 contracts totaling $82.4 million and recommended that FEMA disallow that money as "ineligible contract costs."

FEMA only partially followed the audit's recommendation. Instead of disallowing the recommended $82.4 million in federal grant funding, FEMA planned to disallow—or "deobligate," as it puts it—only $7,998,081. FEMA concluded that Holy Cross spent federal grant funds on ineligible improvements to its campus that went beyond the permissible

replacement costs to rebuild to the building's pre-Katrina state. FEMA invited Holy Cross to supply additional documentation supporting its claimed costs during final inspection for FEMA to consider and explained that "[s]hould Holy Cross supply adequate supporting documentation, FEMA may reinstate costs accordingly."

Holy Cross appealed this decision to FEMA. During that appeal, FEMA twice requested supporting documentation from Holy Cross and met with representatives from the school on several occasions. Holy Cross sent FEMA a PowerPoint presentation and some of the requested documentation. Ultimately, FEMA granted the first appeal in part, allowing an additional $3 million in reasonable costs, reducing the deobligated amount to $4,829,095.90.

Holy Cross again appealed, and FEMA denied the appeal in full. The agency concluded that Holy Cross made improper improvements to its campus and failed to follow federal contract-procurement standards, so it affirmed the approximately $4.8 million deobligation.

Holy Cross then filed suit against FEMA and its administrator, Deanne Criswell, under the Administrative Procedure Act seeking an order vacating FEMA's order and remanding to the agency. Both parties filed cross-motions for summary judgment, and the district court granted Criswell and FEMA's motion and denied Holy Cross's. Holy Cross appeals and presses two arguments. First, Holy Cross contends that the Stafford Act protects Holy Cross from deobligation. Second, it argues that FEMA acted arbitrarily and capriciously.

## II

We review a district court's grant of summary judgment *de novo*, applying the same standards as the district court. *Lexon Ins. Co., Inc. v. Fed.*

*Deposit Ins. Corp.*, 7 F.4th 315, 320 (5th Cir. 2021) (citing *Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 435 (5th Cir. 2013)).

Under the APA, the Court must uphold the agency's action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The court's "task is to determine whether the agency examined the pertinent evidence, considered the relevant factors, and articulated a reasonable explanation for how it reached its decision." *Associated Builders & Contractors of Tex., Inc. v. Nat'l Lab. Rels. Bd.*, 826 F.3d 215, 219 (5th Cir. 2016) (citation and quotation marks omitted). "This standard is highly deferential; we apply a presumption of validity." *Id.* at 220. However, this review is "not toothless." *Wages & White Lion Invs., L.L.C. v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1136 (5th Cir. 2021) (citation omitted).

### III

### A

Holy Cross first contends that the Stafford Act prohibits FEMA from deobligating these funds. Holy Cross cites 42 U.S.C. § 5205(c), which protects "State or local government[s]" from "reimbursement or any other penalty for any payment made under this chapter" at a project's closeout where three requirements are met.[1] Even though Holy Cross concedes that § 5205(c) "does not specifically mention private nonprofits," it contends

---

[1] The three requirements are: (1) the payment was authorized by an approved agreement specifying the costs; (2) the costs were reasonable; and (3) the purpose of the grant was accomplished. § 5205(c). Holy Cross contends, and FEMA does not dispute, that these requirements are met with respect to its grant funding. Because we find that private nonprofits may not invoke § 5205(c), we need not address whether Holy Cross has met the requirements.

No. 23-30085

that § 5205(c) nonetheless protects it from FEMA's disallowance. We disagree.

"The task of statutory interpretation begins and, if possible, ends with the language of the statute." *Franco v. Mabe Trucking Co., Inc.*, 3 F.4th 788, 792 (5th Cir. 2021) (quoting *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 486 (5th Cir. 2013)). "When interpreting statutory language, words are given their ordinary, plain meanings, and language must be enforced unless ambiguous." *United States v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023) (citation omitted). We are "authorized to deviate from the literal language of a statute only if the plain language would lead to absurd results, or if such an interpretation would defeat the intent of Congress." *Kornman & Assocs., Inc. v. United States*, 527 F.3d 443, 451 (5th Cir. 2008) (citation omitted).

Here, the text of the Stafford Act is clear and unambiguous: § 5205(c) protection extends to "State or local government[s]," and to no other group.[2] § 5205(c). Holy Cross cites no statutory ambiguity, and indeed, the school concedes that § 5205(c) "does not specifically mention private nonprofits" as a protected group. Ordinarily, we "resist reading words or elements into a statute that do not appear on its face." *Bates v. United States*, 522 U.S. 23, 29 (1997).

Further, Congress mentioned private nonprofits elsewhere in the Stafford Act, but chose not to include them here. For example, the Stafford Act specifically allows for federal grants for both "State or local government[s]" and "private nonprofit[s]." § 5172(a)(1)(A)–(B). But

---

[2] FEMA cites an agency policy statement that supports this plain reading of the text. It states that "Section 705(c) [of the Stafford Act, codified at 42 U.S.C. § 5205(c)] does not apply to private nonprofit [subgrantees]." Although this policy statement may be "entitled to respect" under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), the parties have not adequately briefed this doctrine. We need not resort to *Skidmore* deference here.

Congress extended § 5205(c) protection *only* to "State or local government[s,]" and not private nonprofits. *Id.* § 5205(c). Where Congress "includes particular language in one section of a statute but omits it in another," we "generally presume" that Congress acted "intentionally and purposely in the disparate inclusion or exclusion." *Rodriguez-Avalos v. Holder*, 788 F.3d 444, 451 (5th Cir. 2015) (quoting *Brown v. Gardner*, 513 U.S. 115, 120 (1994)).

Holy Cross also argues that despite the text's clarity, private nonprofit subgrantees receive a sort of derivative protection because nonprofits can only receive funding through a "State or local government" grantee, which would be protected under § 5205(c). Taken to its logical conclusion, Holy Cross's argument would extend § 5205(c) protection to *every* subgrantee who receives public assistance funding, because that funding must first pass through a state grantee.

At any rate, the Stafford Act specifically contemplates FEMA's recovery of funds from subgrantees like nonprofits elsewhere. FEMA is statutorily instructed to "collect" federal disaster grant funding from those that received it if the federal funding "duplicates benefits available to the person for the same purpose from another source." 42 U.S.C. § 5155(c). Holy Cross's reading of § 5205(c) would nullify this provision, which it cannot do. *See Doe v. KPMG, LLP*, 398 F.3d 686, 688 (5th Cir. 2005) (citation omitted) ("When interpreting a statute, we start with the plain text, and read all parts of the statute together to produce a harmonious whole.").

Holy Cross also advances several policy arguments for the benefit of nonprofit protection. Policy arguments cannot displace the text as enacted by Congress, who "has the right to make th[e] choice" of who receives § 5205(c) immunity, even if that choice is "ill-advised." *Miss. Poultry Ass'n, Inc. v. Madigan*, 31 F.3d 293, 310 (5th Cir. 1994).

Because § 5205(c) does not protect private nonprofits, Holy Cross may not invoke that provision to avoid deobligation.

B

Holy Cross also contends that FEMA acted arbitrarily and capriciously. It presses five arguments in support of this contention, none of which succeed.

1

Holy Cross first argues that FEMA improperly failed to consider that Holy Cross used its own funds to pay for improvements to its campus.

Under the APA, an agency decision is

> arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Sierra Club v. U.S. Env't Prot. Agency*, 939 F.3d 649, 663–64 (5th Cir. 2019). In other words, we must ensure that an agency "reasonably considered the relevant issues and reasonably explained the decision." *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 855 (5th Cir. 2022) (quoting *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

The Stafford Act contemplates federal funding for private nonprofits to repair, restore, reconstruct, or replace a facility to its pre-disaster design. *See* 42 U.S.C. § 5172(a)(1)(B). But generally, a private nonprofit may not use

federal funding to improve upon a facility's pre-disaster design.[3] *Id.* If it wishes to construct improvements, it must do so at its own expense.

During FEMA's review, it concluded that Holy Cross "constructed/installed multiple items" that did not appear in the pre-Katrina campus, like a "five-story tower," "new cupula," and "two sets of architectural double doors" in the Administrative Building. It also identified "costs related to heating, cooling, and air conditioning [] and electrical work" in the Central Services Plant that exceeded the facility's pre-disaster functionality. Because Holy Cross submitted pay applications and requested federal funding for these ineligible costs, FEMA deobligated those costs. Holy Cross argues that it paid for these items with privately raised funds, and that FEMA ignored this fact when making its decision.

In the main, Holy Cross's argument fails because FEMA's review was to ensure that federal funds were not used on improvements. Because Holy Cross sought federal funding for ineligible improvement costs, FEMA deobligated costs associated with those improvements. As the district court explained, it is immaterial to FEMA's review whether Holy Cross paid for improvements with its own dime, so long as Holy Cross does not also use *federal* dollars for those ineligible improvements. FEMA thus has not "failed to consider an important aspect of the problem" as Holy Cross maintains. *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43; *see also Data Mktg. P'ship, LP*, 45 F.4th at 855.

Further, Holy Cross has never once supported its claim that the school used private instead of federal funds for these improvements, despite having the opportunity to do so in an agency audit, multiple requests for

---

[3] Improvements are permitted in some circumstances with prior approval. 44 C.F.R. § 206.203(d)(1).

supplemental documentation, two administrative appeals, a district court proceeding, and the present appeal. *Huawei Techs. USA, Inc. v. Fed. Commc'ns Comm'n*, 2 F.4th 421, 453 (5th Cir. 2021) (rejecting argument that Federal Communications Commission judgment was arbitrary and capricious where appellant did "not point us to record evidence" on the "relevant data"). We will not sift through a fifteen-thousand-page record to make Holy Cross's case for it. *R.P. ex rel. R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 811 (5th Cir. 2012) ("A party's argument must contain appropriate citations to relevant parts of the record." (citing Fed. R. App. P. 28(a)(9))).

When pressed on this point at oral argument, Holy Cross cited several documents, none of which remedy the failure of its brief. First, Holy Cross cited a spreadsheet that supposedly contains a complete cost-breakdown for all money—public and private—spent during construction. This thirteen-page document contains hundreds of line items for everything from tubas to land purchases, but it provides only aggregate costs of buildings (*e.g.*, more than $26 million for the Administration Building) without identifying the component costs of individual construction costs like the "towers" or "cupula" identified by FEMA.

At any rate, the spreadsheet does not identify who paid for these aggregate building costs, and it curiously lists *all* construction costs for the four buildings in the "rebuild" column of the spreadsheet (*i.e.*, eligible for federal funding) instead of "non-rebuild," suggesting that Holy Cross considered all building costs reimbursable by FEMA. As the district court cogently put it, this spreadsheet raises "more questions than it answers."

Holy Cross also cited affidavits from its chief financial officer and former architect, but again, neither of these documents suggests that Holy Cross paid for any ineligible costs. Holy Cross also argued that PW 13136

and a GOHSEP study reveal that FEMA knew about the improvements to the Central Services Plant when it accepted the plans. But in those documents, FEMA acknowledged the increased square footage and explicitly *refused* to pay for it, explaining that the associated costs "will not be eligible for FEMA funding."

From the word go, FEMA has instructed Holy Cross to track "all contracts and invoices" for review at project closeout. In the PW approvals, it warned, "This large project will be closed in accordance with the grantees closeout procedures and 44 [C.F.R. §] 13. Cost[s] outside of the original scope of work (i.e., improvements) must be documented accordingly and are the responsibility of the applicant." FEMA followed through on those warnings at closeout. It identified specific ineligible improvements, invited Holy Cross to submit supplemental documents to justify the costs, and eventually deobligated the costs when Holy Cross failed to do so.

On the record before us, we cannot say that FEMA failed to account for "'relevant factors' or evinced a 'clear error of judgment.'" *Data Mktg. P'ship, LP*, 45 F.4th at 855. This argument fails.

2

Holy Cross next argues that FEMA failed to articulate a "rational relationship between the facts and FEMA's decision." According to Holy Cross, it provided "all of the information requested by FEMA to show that the funds used for improvements were private."

An agency acts "reasonably and permissibly" when it "examines the relevant data and articulates a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *El Paso Elec. Co. v. Fed. Energy Regul. Comm'n*, 832 F.3d 495, 503 (5th Cir. 2016) (citation omitted) (alterations adopted).

Here, FEMA's appeal decisions respond in detail to the supplemental documentation that Holy Cross submitted and articulate the reasons for the agency's actions, tying those reasons to the facts. Indeed, in the first appeal, FEMA reduced the disallowed amount in direct response to supplemental documentation provided by Holy Cross.

In the second appeal, FEMA reviewed Holy Cross's submitted documentation but concluded that it failed to "distinguish between eligible and ineligible work." FEMA did not fail to establish a rational connection between the facts and decision. *Fed. Energy Regul. Comm'n v. Elec. Power Supply Ass'n*, 577 U.S. 260, 295 (2016), *as revised* (Jan. 28, 2016) (rejecting similar argument where Federal Energy Regulatory Commission "addressed that issue seriously and carefully, providing reasons in support of its position and responding to" arguments). This argument also fails.

3

Holy Cross next argues that FEMA was arbitrary and capricious in not relaxing contract procurement standards for the construction of Holy Cross's permanent Gentilly campus because of the exigent circumstances following Hurricane Katrina.

Recipients of public assistance funding must follow federal and state contract-procurement standards when contracting for eligible work. Federal law generally requires competitive contract procurement, meaning bidding is required. 2 C.F.R. § 200.320(b). In exigent circumstances, however, FEMA relaxes these contract-bidding requirements. *Id.* § 200.320(c).[4]

_____

[4] Section 200.320(c) relaxes federal contract procurement standards, but it does not relax cost eligibility criteria. So, FEMA's deobligation based on Holy Cross's improvements are not at issue here.

In the 2015 audit, FEMA recognized that "Holy Cross worked under exigent conditions" to open its temporary campus in January 2006—just a few months after the hurricane made landfall—and relaxed procurement protocols for several contracts associated with that opening. The agency explained though that the exigent circumstances ended when the temporary campus reopened, so Holy Cross was required to follow procurement protocols for the permanent campus in Gentilly. In Holy Cross's second administrative appeal, FEMA concluded that the school failed to show how exigent circumstances applied to the permanent Gentilly contracts. We agree.

Both parties cite favorably a FEMA manual, which "defines both exigency and emergency as situations that demand immediate aid or action" to "avoid, prevent, or alleviate serious harm or injury, financial or otherwise." FEMA, Procurement Disaster Assistance Team Field Manual 52–53 (Oct. 2021). In its 2015 audit, FEMA explained that it considered circumstances "exigent when lives or properties are at-stake or, as in this case, when a city or community needs to reopen its schools."

We are hard-pressed to say that FEMA was arbitrary and capricious in concluding that the exigent circumstances ended when the temporary school opened. FEMA's conclusion that any exigency ended when Holy Cross resumed classroom instruction and could fulfill its primary purpose, albeit in a temporary setting, was at least "logical and rational." *Sierra Club*, 939 F.3d at 664. And when Holy Cross started to contract for its permanent campus, more than a year had elapsed since the storm, and the temporary campus had already opened.

Holy Cross makes a thin attempt to show that exigent circumstances continued after the temporary school opened, asserting that it took "years" for the city to return to a sense of normalcy because of the "scale of

destruction" in New Orleans following Hurricane Katrina.  We sympathize with the plight of New Orleanians and others affected by the historic destruction of Hurricane Katrina, and we recognize the immense struggle facing those that helped to rebuild the Gulf Coast.  But Holy Cross's assertions do not show how following regular procurement protocols would have caused Holy Cross "serious harm or injury, financial or otherwise." For example, Holy Cross does not show that contract costs were still significantly heightened at the time it sought contracts for its permanent campus, or that it would have been unable to follow the normal bidding procedures required by federal law.  *See Balt. Gas & Elec. Co. v. Fed. Energy Regul. Comm'n*, 954 F.3d 279, 281–86 (D.C. Cir. 2020) (concluding that an agency reasonably found that a company did not submit filing in a "reasonable period of time" when it "failed to offer an adequate reason for the delay").  This argument also fails.

4

Next, Holy Cross argues that FEMA erred in using a cost-estimating software, RS Means,[5] to estimate the costs of ineligible improvements.

As discussed above, FEMA instructed Holy Cross to retain invoices to verify at closeout that "only eligible portions of the construction are included in the FEMA funding."  But when Holy Cross invoiced $6.4 million in construction costs for the campus Central Services Plant, FEMA concluded that the building—which was rebuilt with 4,600 additional square feet and improved HVAC and plumbing systems—included ineligible improvements.  Because Holy Cross's documents did not sufficiently track

---

[5] RS Means "is a cost estimator that accounts for regional differences in labor and materials costs by using zip codes to factor in the specific costs of nearly any type of construction in a particular area of the country."  *In re CertainTeed Fiber Cement Siding Litig.*, 303 F.R.D. 199, 205 (E.D. Pa. 2014).

costs, FEMA was unable to isolate the precise improvement costs from the total invoiced amount. So, FEMA used RS Means to calculate the reasonable cost of a hypothetical, unimproved building that could replace the damaged facility. The invoiced costs, minus the RS Means estimate, results in the estimated improvement costs ineligible for federal funding.

Although it concedes that "FEMA can use whatever method it desires in determining reasonableness" of costs, Holy Cross contends that it was arbitrary and capricious to use RS Means, which is a *pre*-construction cost-estimating tool that should not be used to estimate *post*-construction costs. The school also argues that FEMA arbitrarily and capriciously "changed methods," disregarding Holy Cross's reliance on the initial approval of plans. Specifically, the school relied on FEMA's initial approval of the proposed plan for the Central Services Plant, which conditionally approved the building's cost. Holy Cross suggests FEMA used a different cost-estimating method when approving the plan, and later "chang[ed] methods[,]" using RS Means to deobligate. Holy Cross cites nothing in support of this contention, and its argument fails for several reasons.

First, FEMA's approval of the Central Services Plant PW explained that its estimate was not a blank check. Rather, as explained to Holy Cross, the final federal share of costs would be determined at the project's closeout when adjustments would be made for unreasonable costs associated with improvements.

Second, FEMA routinely uses RS Means to calculate post-construction costs, and the use of the software is contemplated in FEMA's manuals. *See, e.g.*, *In the Matter of City of Hattiesburg*, 22-1 B.C.A. (CCH) ¶ 37986 (July 29, 2021) ("However, if appropriate local data cannot be developed, FEMA guidance recommends the use of industry standard construction cost estimating resources, such as RSMeans."). Indeed, the

record reveals that FEMA used RS Means to estimate costs for the Central Services Plant when providing its initial cost estimate approvals, in direct conflict with Holy Cross's uncited suggestion to the contrary.

Instead of RS Means, Holy Cross asked FEMA in its administrative appeals to calculate ineligible improvement costs using a "proportionality model," which would calculate improvement costs solely on the amount of square-footage overbuild. For example, because the Central Services Plant was one-third bigger than the previous building, only one third of the total cost should be deobligated under the proportionality model. But FEMA explained the factual and legal errors of this model and rejected it. "It is not for [the court] to ask whether [the] decision was the best one possible or even whether it was better than the alternatives." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2571 (2019) (citation and internal quotation marks omitted). Rather, the agency need only "examine the relevant data and articulate a satisfactory explanation for its action . . . ." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43. It did so here.

Third, Holy Cross fails to articulate how FEMA improperly changed its policy. When an agency changes course, it must consider "serious reliance interests" that its "longstanding policies may have engendered" along with "alternatives that are within the ambit of the existing policy." *R.J. Reynolds Vapor Co. v. Food & Drug Admin.*, 65 F.4th 182, 189 (5th Cir. 2023). As addressed above, FEMA has consistently used RS Means to estimate improvement costs. Further, FEMA repeatedly instructed Holy Cross to "[t]rack any improvements" and explained that any improvement costs would be Holy Cross's responsibility. That policy—a refusal to use federal money for improvements to the Central Services Plant—never changed. The agency later acted under that long-stated policy to deobligate funds associated with the Central Service Plant's overbuild.

This argument also fails.

5

Finally, Holy Cross argues that FEMA's deobligation was arbitrary and capricious because GOHSEP and FEMA approved the initial plans. It maintains that "GOHSEP and FEMA approved all plans for any 'improvements' to the facilities."

Not so. FEMA ultimately deobligated improvement costs associated with four buildings: the High School, Middle School, Central Services Plant, and Administration Building. In the approvals for each of these buildings, FEMA explained that the approved facility will "have the *same* function and *equivalent* capacity as pre-disaster." Holy Cross does not identify a single improvement that FEMA approved for these PWs for which it later deobligated funding. It is also unclear whether GOHSEP ever approved any of the improvements. To the extent it did, GOHSEP's approval is not binding on FEMA, as Holy Cross concedes in its briefing.

IV

Because § 5205(c) does not immunize private nonprofits from deobligation, and because FEMA was not arbitrary and capricious in its dealings with Holy Cross, we AFFIRM.